STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

David W. DOMKE, Defendant-Appellant.

Supreme Court

*No. 2009AP2422–CR. Oral argument September 14, 2011.
—Decided November 1, 2011.*

2011 WI 95

(Also reported in 805 N.W.2d 364.)

272

For the plaintiff-respondent-petitioner the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Martha K. Askins,* assistant state public defender.

An amicus curiae brief was filed by *Robert R. Henak, Rebecca R. Lawnicki* and *Henak Law Office, S.C.,* Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals[1] reversing the circuit court's judgment of conviction and remanding for a new trial based on ineffective assistance of counsel. A jury convicted David W. Domke (Domke) of repeatedly sexually assaulting Alicia S., his stepdaughter, when she was ten years old, in violation of Wis. Stat. § 948.02(1) and § 948.025(1)(a) (2003–04). Domke moved for postconviction relief and a new trial based on the ineffective assistance of his trial counsel, Terrence Woods (Woods). In order to prevail on the ineffective assistance claim, Domke needed to establish both that Woods' performance was deficient and that the deficient performance prejudiced Domke—in other words, that counsel's errors undermine the court's confidence in the result.[2] After a postconviction hearing, the circuit court denied the motion because it concluded that while Domke had shown that Woods performed deficiently, Domke had failed to show that the deficient performance had prejudiced him. The court of appeals, however, concluded that Domke had established cumulative

---

[1] *State v. Domke,* No. 2009AP2422–CR, unpublished slip op. (Wis. Ct. App. Sept. 21, 2010).

[2] *Strickland v. Washington,* 466 U.S. 668, 687, 694 (1984) (setting forth the standard for review of claims of ineffective assistance of counsel).

prejudice from three instances of deficient performance. Thus, the court of appeals reversed the circuit court's denial of Domke's postconviction motion and remanded for a new trial.

¶ 2. We conclude that Domke is not entitled to a new trial due to ineffective assistance of counsel. While we agree with the court of appeals that Woods performed deficiently in three respects during trial, we are not persuaded that these errors prejudiced Domke. We hold that under the totality of the circumstances Domke received a fair trial, and our confidence in the result is not undermined.

¶ 3. Therefore, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

## I. FACTUAL BACKGROUND

¶ 4. The charges against Domke are based on four incidents between June 20, 2005, and December 25, 2005, on which Alicia S. alleged that Domke engaged in sexual contact with her. Specifically, Alicia S. alleged that on all four occasions Domke rubbed his penis on her buttocks and on one occasion Domke also licked her vagina. Alicia S. was ten years old at the time. Alicia S. did not disclose the full extent of the alleged assaults at first, but over time the details of the four incidents emerged.

¶ 5. Approximately six months after the first alleged assault, Alicia S. told two friends, L.H. and J.M., that Domke had sexually assaulted her. J.M. told another friend, whose mother reported the allegations to Alicia S.'s elementary school. The guidance counselor at the school notified the police, and a police officer, Corey Rank (Rank), and a child protection investigator,

Bonnie Anderson (Anderson), interviewed Alicia S. at the school on January 17, 2006. Alicia S. later went to a physician's assistant, Tracey BeFay (BeFay), on January 23, 2006, for a physical examination during which she repeated some of the allegations. In February 2006, Alicia S. began seeing an outpatient therapist, Kim Rusch (Rusch), to address some emotional and behavioral problems she was having that Alicia S. and her natural father, David S., attributed to the alleged abuse. It was through the approximately 20 to 25 therapy sessions with Rusch that Alicia S. provided the full account of the four alleged sexual assaults.

## II. PROCEDURAL HISTORY

¶ 6. On December 18, 2006, Domke was charged with the repeated sexual assault of a child in violation of Wis. Stat. § 948.025(1)(a) (2003–04)[3] based on four alleged incidents of sexual contact with Alicia S. in violation of Wis. Stat. § 948.02(1).[4] A two-day jury trial was held on January 17 and 18, 2008, in the Oconto County Circuit Court, the Honorable Michael T. Judge presiding.

### A. The Trial

¶ 7. Alicia S. testified first, providing a detailed account of the four alleged sexual assaults. Alicia S.

---

[3] Wisconsin Stat. § 948.025(1)(a) (2003–04) provides: "Whoever commits 3 or more violations under s. 948.02(1) or (2) within a specified period of time involving the same child is guilty of: (a) A Class B felony if at least 3 of the violations were violations of s. 948.02(1)."

[4] Wisconsin Stat. § 948.02(1) (2003–04) provides: "First degree sexual assault. Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 13 years is guilty of a Class B felony."

testified: "The first time we were at 344 South Adams Street of Oconto County [Oconto Falls] and we were watching *50 First Dates*. And I had woken up to my pants and underpants pulled down and that Dave was rubbing his penis up and down my — near my anal area."

¶ 8. Regarding the second incident, Alicia S. testified: "I believe we were at 202 Wisconsin Street of Oconto County [Oconto Falls]. And we were downstairs watching TV, and I had woken up to him licking my vagina this time. And he had flipped me over and he was rubbing his penis up and down near my anal area."

¶ 9. Regarding the third incident, Alicia S. testified:

> The third time was also at 202 Wisconsin Street. This time I had went into my mom's bedroom. I crawled in at approximately 6:30 a.m. so I could spend time with her before she went to work. And eventually she got up and went to work. And I had woken up to Dave putting his penis near my anal area, and this time I had felt wetness. And I pretended I was sleeping, and then he eventually got up and went — took a shower and went hunting.

¶ 10. Alicia S. indicated that the fourth incident took place in December of 2005 while she was watching television in her bedroom. Alicia S. testified:

> I was watching [Country Music Television], and this time he had came into my bedroom and he was naked and he was rubbing his penis up and down my anal area. And this time he told me if I took off my clothes it would feel better and I said no. I told him to get out and I locked my door, and I was really, really scared.

¶ 11. Alicia S. also testified that she first reported the sexual assaults to her friends L.H. and J.M. at a

sleepover. Alicia S. explained that she told her friends about the assaults because "it was really bothering" her, but that she did not want them to tell anyone and made them "pinky swear." L.H. confirmed this and testified that Alicia S. told her "that her stepdad had licked her in the privates." L.H. further testified that when Alicia S. told her this, she "acted very upset and she looked like she was going to actually throw up."

¶ 12. Regarding her interview with Anderson and Rank, Alicia S. explained that she did not want to disclose the assaults to them. Alicia S. testified that she was scared and, at that time, did not want Domke to go to jail, so she was not completely honest with Anderson and Rank. Alicia S. stated that, when pressed, she did disclose some of the alleged abuse to them. When Anderson testified, she agreed with Alicia S.'s description of the interview and stated that it was clear that Alicia S. liked Domke very much. Anderson explained that in response to some of her and Rank's questions Alicia S. confirmed that Domke sexually assaulted her:

> [Alicia S.] told us without very specific details that on two different occasions at her mother's house — at actually two different houses in Oconto Falls when she was visiting her mother that her stepfather, David Domke, did put his penis between her buttocks on two different occasions while she was pretending to be sleeping when they were all watching TV together in the living room.

¶ 13. Alicia S. also testified that she was later examined by a physician's assistant, BeFay, to whom she revealed some details of the alleged assaults. BeFay testified that Alicia S. was reluctant to talk with her about the alleged assaults, but that Alicia S. indicated that Domke put his penis on her buttocks and his mouth on her genitals. BeFay testified that the physical

278

examination was normal. During Woods' cross-examination of BeFay, he moved to enter into evidence BeFay's dictated report, which reflected the normal physical examination and also included a summary of what Alicia S. told BeFay about the alleged assaults.

¶ 14. Alicia S. further testified that she began to see a therapist, Rusch, and that, after about 10 to 15 sessions, she told Rusch all of the details regarding the four alleged sexual assaults. Rusch testified regarding the services she provided to Alicia S.:

> She — the problem focus that was on my intake form when she came to me was that she had been sexually assaulted and that she was having some problems with nightmares, intrusive thoughts, flashbacks. She had a lot of fears. She was scared, things like that. So I was asked to deal with those symptoms that come along with that.

Rusch also testified about the progression of her sessions with Alicia S.:

> The first few sessions we basically talked about how she could maybe not be having as many nightmares. We implemented a safety plan because she was very afraid to be outside. She would come home from school and she would be worried somebody was in the house, things like that.

> So we developed a safety plan for her to feel safer in her town here and also at her home and when she had to go to school. So that's what we focused on just to make her more comfortable and have her to be able to, you know, be .functioning relatively normally in the community and in her family.

> And then it was down the road a ways, not until June. I started seeing her in February. And then in June when I finally — Alicia [S.] and I had talked and she was

ready to tell me her whole story. She had told, you know, bits and pieces throughout, but that was when she told me her whole story.

In a report that the State introduced into evidence, Rusch documented "Alicia [S.]'s whole story" regarding the four alleged sexual assaults.

¶ 15. On cross examination, Woods asked Rusch several questions about the first alleged incident. This included the following exchange:

Woods: Could this have just been like a bad dream or something?

[The State objected, and the circuit court overruled the objection.]

Rusch: No. I do not believe it could have been a dream.

Woods: All right. You don't think it was a dream?

Rusch: No. In my professional opinion, it was not a dream.

¶ 16. As his first witness, Woods called Tina Domke, who is Alicia S.'s mother and Domke's wife. Woods asked Tina Domke whether she had told Anderson, the child protection investigator, that she did not believe Alicia S.'s allegations against Domke. Tina Domke responded that, yes, she had told Anderson that she did not believe Alicia S. "[a]t that time." On cross-examination, the State elicited that Tina Domke now believes her daughter's allegations against her husband "100 percent." In response to further questioning, Tina Domke stated that Alicia S. was the bravest girl she knew and that she no longer had any doubt that Alicia S. was telling the truth.

¶ 17. Woods then called Domke's ex-wife, Tina Baxter, and Domke's three children to testify. From each of these witnesses Woods elicited testimony that Domke

had never been accused of sexually abusing any of his biological children. Two of Domke's children also testified that they had never seen Domke sexually abusing Alicia S. while they all lived together. On cross-examination, one of the children admitted that Alicia S. told her about the alleged sexual assaults before those allegations were reported to police, and that she reported Alicia S.'s statements to her when interviewed by Anderson and Rank.

¶ 18. Domke testified and denied ever sexually assaulting Alicia S. Domke stated that he knew Alicia S. lied a lot and that he and Alicia S. argued a lot about her refusal to abide by his rules. On cross-examination, the State elicited from Domke that when he originally spoke to Anderson and Rank he told them that he and Alicia S. had a good relationship.

¶ 19. The jury convicted Domke of all charges, and he was sentenced to 20 years in prison and 20 years of extended supervision.

B. Domke's Postconviction Motion for a New Trial

¶ 20. Domke filed a postconviction motion for a new trial on March 19, 2009, based on ineffective assistance of trial counsel. Domke asserted that Woods performed deficiently in several respects, and that the deficient performance prejudiced him because Woods' errors had erroneously bolstered Alicia S.'s credibility. Domke requested a *Machner* hearing on these issues.[5]

■

¶ 21. First, Domke asserted that Woods erred when he failed to object to Rusch's hearsay testimony

---

[5] A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case." *State v. Balliette,* 2011 WI 79, ¶ 31, 336 Wis. 2d 358, 805 N.W.2d 334.

regarding the reason that Alicia S. sought counseling services. Domke argued that these statements were not covered by the hearsay exception for statements made for purposes of medical diagnosis or treatment, Wis. Stat. § 908.03(4) (2007–08),[6] because statements made to a counselor and social worker, like Rusch, are excluded from that exception. *See State v. Huntington*, 216 Wis. 2d 671, 695, 575 N.W.2d 268 (1998) (declining "to apply the hearsay exception for statements made for medical diagnosis or treatment, Wis. Stat. § 908.03(4), to statements made to counselors or social workers"). Domke asserted that these statements are not admissible as records of regularly conducted activity either, *see* Wis. Stat. § 908.03(6). Second, Domke argued that Woods erred by asking Rusch whether she thought that Alicia S.'s allegations of the first incident may have been the result of a bad dream, which allowed Rusch to state that in her professional opinion, it was not just a bad dream. Third, Domke asserted that Woods erred when he failed to object to the hearsay testimony of L.H., Alicia S.'s friend, which was not covered by the excited utterance or records of regularly conducted

---

[6] Wis. Stat. § 908.03(4) (2007–08) provides:

Hearsay exceptions; availability of declarant immaterial. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

activity exceptions, *see* Wis. Stat. § 908.03(2), (6); Domke said that while Woods may have hoped to establish inconsistencies between L.H.'s and Alicia S.'s testimony, he did not actually do so on cross-examination. Fourth, Domke argued that Woods erred by moving BeFay's report into evidence because he did not have a valid strategic reason for doing so. Fifth, Domke asserted that Woods' most serious error was his decision to call Tina Domke without investigating whether she still doubted the truth of Alicia S.'s allegations.[7]

¶ 22. Domke asserted that these deficiencies prejudiced him because this case was ultimately a credibility contest between Alicia S. and Domke. Domke argued that Woods' mishandling of the testimony of Rusch and L.H., his decision to introduce BeFay's report, and his decision to call Tina Domke as a witness led to the introduction of additional evidence corroborating Alicia S.'s allegations and generally bolstering her credibility.

¶ 23. In the alternative, Domke also sought a new trial in the interest of justice.

¶ 24. The circuit court held a *Machner* hearing on June 12, 2009, at which Woods testified. In response to Domke's first allegation, Woods first stated that he thought some of Rusch's testimony "could have been objectionable" but that he did not want to draw attention to the testimony by objecting. He then stated that this information was admissible because it was recorded in a regularly kept record or because the hearsay exception for statements made for the purposes of medical diagnosis or treatment may apply.

---

[7] Domke criticized other aspects of Woods' handling of Rusch's and BeFay's testimony as well. Domke did not pursue those alleged errors before this court, so we do not address them further.

¶ 25. Regarding Domke's second allegation, concerning Woods' decision to ask Rusch the dream question twice, Woods explained:

> It seemed to me that, you know, maybe the child was having problems. As I understood Alicia, she was a special-ed student. She was on some medication and maybe was just having, you know, nightmares. And I'm not — you know, I'm not an expert in that, but I did want to follow up and that was why.

Woods admitted that he did not know what Rusch would say in response to these questions.

¶ 26. Woods explained in regard to the third alleged deficiency that he did not object to L.H.'s testimony because he also wanted to allow her testimony so that he could bring out inconsistencies in Alicia S.'s testimony. Woods also suggested that the excited utterance or regularly kept records hearsay exceptions might have applied, *see* Wis. Stat. § 908.03(2), (6).

¶ 27. In regard to the fourth allegation, Woods responded that he introduced BeFay's report to show that Alicia S.'s physical examination was normal and also to establish the lapse in time between the alleged sexual assaults and the physical examination.

¶ 28. In response to the fifth allegation, concerning calling Tina Domke to testify without checking her present position, Woods explained that he wanted "to elicit from [Tina Domke] that at the inception of this matter she had indeed not believed her own child." Woods explained, "It was initially at least her view, as expressed to the social services people and the police, that indeed this was not a truthful child that we are talking to now." Woods noted that the police report indicated that "Tina [Domke] said Alicia lies a lot." Woods also stated that by the time of trial he had been

284

"informed that indeed [Tina Domke] had been vacillating" in regard to whether she still believed Alicia S. was lying. He admitted that he had not talked with Tina Domke before trial nor did he recall when he last spoke with her. Woods stated that he relied on the police reports and what Domke told him.

¶ 29. The circuit court denied Domke's postconviction motion, concluding that while Domke had shown that Woods performed deficiently in certain respects, he had failed to establish that the deficiencies prejudiced him. The circuit court concluded that Woods' failure to object to the testimony of Rusch and L.H., and Woods' decision to call Tina Domke constituted deficient performance. In its decision, the circuit court noted that it would have sustained an objection to Rusch's testimony based on *Huntington,* 216 Wis. 2d 671. The circuit court concluded that Woods made reasonable strategic decisions to ask Rusch the dream questions and to introduce BeFay's report into evidence. The circuit court denied Domke's motion because it concluded that, given the totality of the circumstances, including Alicia S.'s "very compelling" testimony, Domke was not prejudiced by Woods' errors.

### C. The Court of Appeals Decision

¶ 30. The court of appeals reversed the circuit court's denial of Domke's postconviction motion based on ineffective assistance of trial counsel. *State v. Domke,* No. 2009AP2422–CR, unpublished slip op. (Wis. Ct. App. Sept. 21, 2010). The court of appeals concluded that Woods performed deficiently by failing to object to Rusch's testimony, by asking Rusch the dream question twice, and by calling Tina Domke as a witness without checking, prior to trial, what her present position was on her daughter's truthfulness.

*Id.*, ¶¶ 3–7. In a footnote, the court of appeals concluded that Woods' decisions regarding L.H.'s testimony and BeFay's report did not constitute deficient performance. *Id.*, ¶ 1 n.1. The court of appeals concluded that it was reasonable for Woods not to object to L.H.'s testimony because it was likely admissible under the residual hearsay exception. *Id.* The court of appeals also concluded that Woods' decision to introduce BeFay's report into evidence was not deficient performance because in closing arguments he used the report to give an example of a prior inconsistent statement by Alicia S. *Id.*

¶ 31. The court of appeals first concluded that Woods performed deficiently by failing to object to Rusch's hearsay testimony without having a strategic basis for that decision or knowing the relevant law. *Id.*, ¶ 3. A reasonable attorney would have been aware of *Huntington's* limitation on the medical diagnosis and hearsay exception and objected on that basis.[8] *Domke,* No. 2009AP2422–CR, ¶ 3. Additionally, Woods' decision to ask Rusch the dream question twice constituted deficient performance because there was such a low probability that she would concede that it could have been a dream. *Id.*, ¶¶ 5–6. Finally, Woods erred by calling Tina Domke as a witness without knowing whether she still believed Domke or now supported Alicia S. *Id.*, ¶ 7. The court of appeals concluded that because the credibility of Alicia S. and Domke was

---

[8] The court of appeals also rejected the State's argument that Rusch's testimony would have been admissible as a hearsay exception under the rule of completeness. *Domke,* No. 2009AP2422–CR, ¶ 4. The State does not argue before this court that the rule of completeness would have provided a basis to admit Rusch's hearsay testimony. We thus do not address it further.

central to the case, the collective prejudice from the testimony of Tina Domke and Rusch required a new trial. *Id.*, ¶ 8.

¶ 32. The State petitioned this court for review of whether Woods performed deficiently by failing to object to Rusch's hearsay testimony and asking Rusch the dream question twice, and if so, whether the collective prejudice of these errors and Woods' decision to call Tina Domke prejudiced the defendant.

## III. ANALYSIS

¶ 33. Whether a defendant received ineffective assistance of counsel presents a mixed question of law and fact. *State v. Thiel*, 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305. This court will uphold the circuit court's findings of fact, "includ[ing] 'the circumstances of the case and the counsel's conduct and strategy,' " unless they are clearly erroneous. *Id.* (quoting *State v. Knight*, 168 Wis. 2d 509, 514 n.2, 484 N.W.2d 540 (1992)). Whether counsel's performance constitutes constitutionally ineffective assistance of counsel, which requires a showing by the defendant that counsel performed deficiently and that the error or errors prejudiced the defendant, presents a question of law that this court decides de novo. *Id.*; *Strickland*, 466 U.S. at 687 (setting forth the two components of an ineffective assistance of counsel claim: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense.").

¶ 34. Wisconsin criminal defendants are guaranteed the right to the effective assistance of counsel through the Sixth and Fourteenth Amendments to the

federal constitution and Article I, Section 7 of the Wisconsin Constitution. *State v. Trawitzki,* 2001 WI 77, ¶ 39, 244 Wis. 2d 523, 628 N.W.2d 801; *Thiel,* 264 Wis. 2d 571, ¶ 18. We measure whether counsel's representation fell below the constitutional minimum for the effective assistance of counsel against the standard set forth by the United States Supreme Court in *Strickland. Trawitzki,* 244 Wis. 2d 523, ¶ 39. Counsel will be said to have provided constitutionally inadequate representation if the defendant can show that counsel performed deficiently and that such deficient performance prejudiced the defendant. *Strickland,* 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Trawitzki,* 244 Wis. 2d 523, ¶ 39 (quoting *Strickland,* 466 U.S. at 686).

¶ 35. Because we conclude that Domke has not established "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," we reverse the court of appeals and affirm the circuit court's judgment of conviction. *See Strickland,* 466 U.S. at 694. While the result is driven by our conclusion that Domke has not established prejudice from the alleged deficiencies, we also examine whether Woods' representation was constitutionally deficient.

## A. Deficient Performance

¶ 36. To establish deficient performance, the defendant must show that counsel's representation fell

below the objective standard of "reasonably effective assistance." *Strickland,* 466 U.S. at 687–88. Reviewing courts should be "highly deferential" to counsel's strategic decisions and make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *State v. Carter,* 2010 WI 40, ¶ 22, 324 Wis. 2d 640, 782 N.W.2d 695 (quoting *Strickland,* 466 U.S. at 689). There is a " 'strong presumption' that [counsel's] conduct 'falls within the wide range of reasonable professional assistance.' " *Id.* (quoting *Strickland,* 466 U.S. at 689).

¶ 37. Domke asserts that the court of appeals correctly concluded that Woods performed deficiently by failing to object to Rusch's hearsay testimony, by asking Rusch the dream question twice and by calling Tina Domke as a witness without checking, prior to trial, what her present position was on her daughter's truthfulness. The State asserts that Woods did not perform deficiently in regard to his handling of Rusch's testimony but does not contest the court of appeals' conclusion that Woods performed deficiently by calling Tina Domke without checking, prior to trial, whether she still doubted her daughter's allegations. We agree with Domke and the court of appeals that these three errors constituted deficient performance; however, because we conclude that these errors did not prejudice Domke, he is not entitled to a new trial.[9]

---

[9] The court of appeals concluded that Woods' handling of L.H.'s testimony and BeFay's report did not constitute deficient performance. *Domke,* No. 2009AP2422–CR, ¶ 1 n.1. Domke did not challenge these decisions before this court; therefore, we do not address these alleged deficiencies further.

### 1. Woods' failure to object to Rusch's hearsay testimony.

¶ 38. On this issue, Domke and the State focus on whether this testimony was admissible as a statement made for purposes of medical diagnosis or treatment, Wis. Stat. § 908.03(4), or whether it was inadmissible because *Huntington* excludes, from that hearsay exception, statements made to counselors and social workers. The State argues that Woods made a reasonable decision not to object to Rusch's hearsay testimony because it was arguably covered by the hearsay exception for statements made for purposes of medical diagnosis or treatment. The State asserts that even though Woods was not familiar with *Huntington*, attorneys are not required to know all obscure and unsettled points of law, and it is debatable whether Rusch's testimony was inadmissible under *Huntington*.

¶ 39. Domke argues that Rusch is either a social worker or a counselor, and thus, her testimony recounting what Alicia S. told her was inadmissible hearsay under *Huntington*'s clear limitation on the medical diagnosis and treatment hearsay exception. Domke asserts that Woods should have objected, at which point it would have been the State's burden to establish that the medical diagnosis and treatment hearsay exception applied despite *Huntington*.[10]

¶ 40. Our recent decision in *Carter* is instructive regarding the extent to which counsel is required to know or investigate the relevant law. 324 Wis. 2d 640.

---

[10] *See State v. Jenkins*, 168 Wis. 2d 175, 187–88, 483 N.W.2d 262 (Ct. App. 1992) ("A party objecting to the admission of evidence need not specify the rule into which the evidence does *not* fit. Rather, the proponent has the burden to show why the evidence is admissible." (citation omitted)).

In *Carter*, defense counsel clearly articulated that he made a strategic decision not to present evidence that the victim may have been previously sexually assaulted by another person. *Id.*, ¶¶ 24–35. Counsel explained that, as a result of this decision, he did not investigate the alleged previous assault or whether evidence of a previous assault would have been admissible. *Id.*, ¶¶ 25, 34–35. This court concluded that counsel did not perform deficiently because his decision not to investigate or introduce this evidence was based on a reasonable trial strategy that was consistent with the overall trial strategy that he pursued. *Id.*, ¶¶ 24–35. Therefore, it was reasonable for counsel not to investigate further if his strategy made such investigation unnecessary.

¶ 41. In *Carter* we explained that "[s]trategic decisions made after less than complete investigation of law and facts may still be adjudged reasonable." *Id.*, ¶ 34. Counsel must either reasonably investigate the law and facts or make a reasonable strategic decision that makes any further investigation unnecessary. *Id.*, ¶ 23 (quoting *Strickland*, 466 U.S. at 691). Woods did neither. Woods did not articulate any valid strategic reason for not objecting to Rusch's hearsay testimony. Having no strategic reason to allow the presentation of Rusch's testimony, a reasonable attorney should have investigated whether it was admissible under one of the hearsay exceptions and, if not, objected to that testimony.

¶ 42. In the *Machner* hearing, Woods mentioned the hearsay exception for statements made for purposes of medical diagnosis or treatment, *see* Wis. Stat. § 908.03(4), but he did not appear familiar with the limitations on that exception. Wisconsin courts have

applied that hearsay exception to statements made to psychologists, psychiatrists, chiropractors and nurse practitioners in addition to other medical doctors. *Huntington,* 216 Wis. 2d at 694–95. In *Huntington,* this court "decline[d] . . . to apply the hearsay exception for statements made for medical diagnosis or treatment, Wis. Stat. § 908.03(4), to statements made to counselors or social workers." 216 Wis. 2d at 695.

¶ 43. Rusch testified that she is an outpatient therapist with "a [b]achelor's degree in psychology and a [m]aster's degree in education with an emphasis in community counseling." She did not state that she fits within any of the professions to which *Huntington* allowed application of the exception. Based on the available information, a reasonable attorney would have been familiar with Huntington's limitation on the medical diagnosis or treatment hearsay exception and would have objected to Rusch's hearsay testimony on that basis.

¶ 44. Contrary to the State's argument, this rule from *Huntington* is not obscure or unsettled law. *State v. Maloney,* 2005 WI 74, ¶ 28, 281 Wis. 2d 595, 698 N.W.2d 583 (holding that counsel is not required to argue an unsettled or unclear point of law). The annotations to Wis. Stat. § 908.03 in both the 2005–06 and 2007–08 Wisconsin Statutes provide: "The hearsay exception for medical diagnosis or treatment under sub. (4) does not apply to statements made to counselors or social workers. *State v. Huntington,* 216 Wis. 2d 671, 575 N.W.2d 268 (1998)." The edition of Professor Daniel Blinka's treatise on Wisconsin Evidence available at the time of trial also states, "With little discussion, § 908.03(4) has been extended to psychologists, psychiatrists, and chiropractors. The supreme court has drawn the line, however, at statements made to 'counselors or

292

social workers.' " Daniel D. Blinka, *Wisconsin Practice Series:* Wisconsin Evidence § 803.4, at 611–12 (2d ed. 2001) (footnote omitted). Judge Ralph Adam Fine's treatise on Wisconsin Evidence, as updated in 2007, also explained that "[s]tatements made to counselors or social workers are not within" the medical diagnosis or treatment hearsay exception. Ralph Adam Fine, *Fine's Wisconsin Evidence,* § 908.03(4), at 908–45 (2007).

¶ 45. *Huntington* provides a clear basis upon which Woods could have objected to Rusch's hearsay testimony. While the State advocates an alternative reading of *Huntington,* the well-settled interpretation of *Huntington*—that it excludes statements made to counselors and social workers from the medical diagnosis and treatment hearsay exception—would have been grounds for Woods' objection. 216 Wis. 2d at 695; *see also* Wis. Stat. Ann. § 908.03 (West 2007–08). From Woods' perspective as defense counsel, and with no strategic reason to allow Rusch to present this hearsay testimony, he should have objected. The circuit court noted in its decision on Domke's postconviction motion that it would have sustained an objection on that basis.

¶ 46. Under all the circumstances set forth herein, Woods performed deficiently by failing to object to Rusch's hearsay testimony, not because allowing the testimony was part of his trial strategy, but because he was unfamiliar with *Huntington's* limitation on the medical diagnosis or treatment hearsay exception.

### 2. Woods' decision to ask Rusch the dream question twice.

¶ 47. The State argues that it was reasonable for Woods to ask Rusch whether she thought that Alicia S.'s allegation regarding the first incident could have

stemmed from a bad dream even though he was not sure what Rusch would say. The State asserts that it was reasonable for Woods to explore this theory because he "did not have much to work with in preparing a defense." According to the State, it was consistent with his overall trial strategy to establish that the first alleged sexual assault could have just been a bad dream.

¶ 48. Domke argues that Woods' decision to ask Rusch the dream question twice was not a reasonable trial strategy. Domke asserts that it was unreasonable for Woods to ask this question because he had no reason to believe that Rusch might concede that the first alleged assault could be based on a bad dream.

 

¶ 49. This court will not second-guess a reasonable trial strategy, but this court may conclude that an attorney's performance was deficient if it was based on an "irrational trial tactic" or "based upon caprice rather than upon judgment." *State v. Felton,* 110 Wis. 2d 485, 503, 329 N.W.2d 161 (1983). Woods asserted that his theory of the case would have been supported if Rusch had conceded that the first assault could have been just a bad dream. However, Woods could not provide any information that he had to suggest that Rusch might concede that possibility. When Rusch responded with a fairly emphatic "no" the first time, Woods asked Rusch this question again, which allowed Rusch to highlight that "[i]n [her] professional opinion, it was not a dream." While it may have been reasonable to ask once, it was incautious and inconsistent with any rational trial strategy for Woods to ask Rusch a second time whether she thought the first assault might be the result of a bad dream. We agree with the court of appeals that Woods' error in this regard constituted deficient performance.

### 3. Woods' decision to call Tina Domke as a witness.

¶ 50. The State does not argue that Woods' decision to call Tina Domke as a witness without knowing whether she still doubted Alicia S.'s allegations against Domke was consistent with constitutionally adequate representation. Domke asserts that the circuit court and the court of appeals correctly concluded that Woods' decision to call Tina Domke as a witness under the circumstances constituted deficient performance.

¶ 51. When Woods decided to call Tina Domke as his first witness, he had the following information. The police report reflected that when Anderson and Rank first spoke with Tina Domke and the defendant about the alleged assaults, Tina Domke stated that Alicia S. often lied. Domke also told him that his wife had been vacillating regarding whom she believed—Alicia S. or Domke. Woods did not speak with Tina Domke before calling her to the stand or further investigate whether she still doubted Alicia S.'s allegations at the time of trial.

¶ 52. "[C]ounsel has a duty to make reasonable investigations" or to make a strategic decision that makes further investigation unnecessary. *Thiel,* 264 Wis. 2d 571, ¶ 40 (quoting *Strickland,* 466 U.S. at 691). Woods explained that he wanted to elicit from Tina Domke that she initially told police that Alicia S. lied a lot and that she believed Domke when he said he did not assault her. This may have provided a reason to consider calling Tina Domke as a witness; but it does not provide a reasonable explanation for why Woods failed to talk with Tina Domke first or do any further investigation. Tina Domke, as the mother of the victim and the wife of the defendant, was in a unique position to comment on the credibility of Alicia S. and Domke. By

calling her as a witness and asking whether she initially believed Alicia S.'s allegations, Woods allowed the State to elicit from Tina Domke that she now believed Alicia S. "100 percent." A reasonable attorney, knowing that a witness had been vacillating regarding whom she believed, would have done some investigation when faced with the risk of calling a witness who may provide either extremely useful or extremely damaging testimony. If Woods had talked with Tina Domke he would have discovered that at the time of trial she completely believed Alicia S. and would have realized that the harm from her testimony to that effect likely outweighed any benefit from her testimony that she originally doubted Alicia S.

¶ 53. Woods' decision to call Tina Domke as a witness without doing any reasonable investigation into what she might say, even after Domke told him that Tina Domke was vacillating regarding whether she believed Alicia S. or Domke, constitutes deficient performance. We now turn to whether this error along with Woods' errors regarding Rusch's testimony prejudiced the defendant. We conclude they did not.

## B. Prejudice

¶ 54. To establish prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that,

absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. We examine the totality of the circumstances to determine whether counsel's errors, in the context of the entire case, deprived the defendant a fair trial. *Thiel,* 264 Wis. 2d 571, ¶¶ 62–63; *Strickland,* 466 U.S. at 695. "It is not sufficient for the defendant to show that his counsel's errors 'had some conceivable effect on the outcome of the proceeding.' " *Carter,* 324 Wis. 2d 640, ¶ 37 (quoting *Strickland,* 466 U.S. at 693).

¶ 55. The State argues that even if Woods' performance was deficient regarding the testimony of both Rusch and Tina Domke, there was not sufficient prejudice to warrant a new trial given the totality of the circumstances. The State further argues that Rusch's testimony was merely cumulative of Alicia S.'s and BeFay's testimony because her report was what Alicia S. used to refresh her recollection, was admitted in evidence, and was consistent with Alicia S.'s testimony. The State asserts that the court of appeals, in reaching its conclusion to the contrary, failed to consider the strong evidence against Domke. This included Alicia S.'s detailed and credible testimony, the testimony of L.H. and BeFay corroborating her testimony, and Alicia S.'s statements that she had loved Domke and initially did not want to report the abuse because she did not want to break up her family. Such testimony strongly supported a conclusion that she had no motive to fabricate the allegations.

¶ 56. Domke argues that the court of appeals properly concluded that the cumulative effect of these errors prejudiced Domke. Domke further asserts that Rusch's corroboration of Alicia S.'s testimony and her testimony that she did not think the assault allegation was the result of a bad dream were damaging to Domke

297

because of her familiarity with Alicia S. and her expertise. In Domke's view, Tina Domke's testimony was the most damaging because of her close relationship to both Alicia S. and Domke.

■

¶ 57. We are convinced, based on our review of the totality of the evidence, that Domke received a fair trial. This case boiled down to a credibility contest between Alicia S. and Domke. Woods' errors may have strengthened the State's case against Domke by providing additional corroboration for Alicia S.'s testimony and bolstering her credibility. However, even excluding the evidence admitted due to his errors, the State had a very strong case. Upon examining the totality of the circumstances we are not persuaded that, but for Woods' errors, the result would have been any different. *See Strickland*, 466 U.S. at 694–95. Thus, Woods' errors did not prejudice Domke, and he is not entitled to a new trial.

¶ 58. The circuit court noted in its decision denying Domke's postconviction motion that Alicia S.'s testimony "was very compelling." We will uphold the circuit court's credibility determination unless it is clearly erroneous. *Thiel*, 264 Wis. 2d 571, ¶ 23. Our review of the record leads us to agree with the circuit court's determination in that regard. Alicia S. provided detailed, credible testimony including the details of each assault, details that were consistent with the testimony of L.H., Anderson and BeFay. Alicia S. admitted that she did not disclose the details of all of the alleged assaults to each of these people, and that she initially lied to Anderson and Rank when they interviewed her because she was scared and wanted to protect Domke. The prosecutor established through Anderson that it is not unusual for sexual assault victims to delay report-

ing or disclosing assaults. He highlighted this point in his closing argument. Woods vigorously cross-examined Alicia S. but failed to establish any inconsistencies other than those she had already admitted to and explained during her direct examination testimony.

¶ 59. Other evidence also supported Alicia S.'s credibility. Alicia S. testified that she had loved Domke and initially lied to Anderson and Rank to hide the alleged assaults because she did not want Domke to go to jail. This was confirmed by the testimony of both Anderson and Domke, who admitted that he told Anderson when she interviewed him that he and Alicia S. had a good relationship. The fact that Alicia S. initially lied to protect Domke supports her credibility because it explains the inconsistencies between her testimony at trial and her statements to Anderson. It also provides a potential reason for her delay in reporting the alleged abuse and her reluctance to disclose the full extent of the alleged assaults. The prosecutor noted in closing that Alicia S.'s feelings towards Domke provide a reason for her to lie to Anderson and Rank to protect Domke, and suggest that she had no motive to make up the allegations against him. Additionally, the testimony from L.H., Anderson, David S., and BeFay that Alicia S. was very upset by the alleged sexual assaults supports the conclusion that they actually occurred. Specifically, David S. testified that Alicia S.'s behavior changed after the alleged assaults took place, which was why he took her to see Rusch.

¶ 60. Domke does not argue that there was any evidence that he was precluded from presenting as a result of counsel's errors.[11] Domke chose to testify. He

---

[11] The nature of Woods' errors distinguishes this case from *State v. Thiel,* 2003 WI 111, ¶¶ 63–80, 264 Wis. 2d 571, 665

denied the allegations and attacked Alicia S.'s credibility by stating that she lied a lot and suggesting that she had a motive to fabricate the allegations because she and Domke did not have a good relationship. On cross-examination, Domke admitted that he initially told Anderson and Rank that he and Alicia S. got along well, were affectionate and had a particularly close relationship. Domke's ex-wife Tina Baxter and their three children testified that they never saw the alleged assaults or knew of other similar allegations against Domke.

¶ 61. Even excluding the testimony of Rusch and Tina Domke that was admitted as a result of Woods' errors, it is clear that the State had a very strong case against Domke. There were errors on the part of trial counsel, but under the totality of the circumstances, we cannot say that there is a reasonable probability that but for Woods' deficient performance the result would have been different.[12]

N.W.2d 305, in which this court determined that Thiel was prejudiced by the cumulative effect of his counsel's errors. In *Thiel,* this court examined the totality of the circumstances at trial and concluded that Thiel was prejudiced by his counsel's errors, which kept significant evidence from the jury that would have undermined the complainant's credibility. *Id.* In this case, Domke does not allege that Woods' errors precluded him from presenting evidence that would have impeached Alicia S.'s credibility, and we conclude that, under the totality of the circumstances in this case, the cumulative effect of Woods' errors did not prejudice Domke.

[12] Domke also makes a one-and-a-half-page alternative argument inviting this court to affirm the court of appeals and grant him a new trial in the interest of justice because the real controversy was not fully tried. *See State v. Hicks*, 202 Wis. 2d 150, 159–60, 549 N.W.2d 435 (1996). We decline to do so. The

## IV. CONCLUSION

¶ 62. We conclude that Domke is not entitled to a new trial due to ineffective assistance of counsel. While we agree with the court of appeals that Woods performed deficiently in three respects during trial, we are not persuaded that these errors prejudiced Domke. We hold that under the totality of the circumstances Domke received a fair trial, and our confidence in the result is not undermined.

¶ 63. Therefore, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

---

testimony of Rusch and Tina Domke did not "so cloud[] a crucial issue" such that the real controversy was not fully tried. *Id.* at 160. The real controversy was whether the jury believed Alicia S.'s allegations or Domke's denials. As described above, there was substantial evidence supporting Alicia S.'s allegations, the circuit court found her to be a very credible witness, and Domke was not precluded from presenting a defense. The real controversy was tried in this case.